McQUAID ET AL. *v.* STATE EX REL. SIGLER.

[No. 26,464. Filed February 11, 1937. Rehearing denied April 27, 1937.]

*A. Ottenheimer, Glenn D. Peters, Bomberger, Peters & Morthland,* for appellants.

*Twyman & Friedman* and *Frank E. Keenan,* for appellee.

FANSLER, J.—Relatrix began this action to mandate the school board of the city of East Chicago to reinstate her as a permanent teacher in the public schools of that city. There was a trial, special findings of fact, conclusions of law, and judgment in favor of relatrix.

Error is assigned upon the conclusions of law.

Having served under contract as a teacher for five years, relatrix, in June, 1930, entered into a written contract with the school board under which she became a tenure teacher. On May 10, 1923, the board adopted a resolution to the effect that married women would not thereafter be employed as teachers, and relatrix' contract for the year 1927, and all subsequent contracts, contained a provision that, in the event she should be dismissed "for incompetency, cruelty, gross immorality, neglect of business, marriage (if woman), or violation of any of the stipulations of this contract," she should

not be entitled to compensation after notice of dismissal. It was further provided in the contract: "Said teacher agrees . . . to observe all rules and regulations of the properly constituted school authorities." On August 5, 1930, relatrix married. Pursuant to notice and statement of reasons given relatrix, the board, at a hearing held on October 22, 1930, considered the question of the cancellation of relatrix' contract, and made a finding that: "Alice Velcheck, now Mrs. Alice Sigler, has violated the terms of her contract and the rules of the Board of Education by her marriage." The board then, upon motion, canceled her contract, and, on October 27, 1930, notified her of its action.

Appellants contend that the judgment is erroneous for two reasons: (1) That the Teachers' Tenure Act is unconstitutional in that it violates article 1, §23, of the Constitution of Indiana; and (2) that relatrix's marriage constituted a violation of a reasonable rule which the board had the power to adopt, and a breach of a contractual obligation which the parties had the power to make.

The Teachers' Tenure Act has been upheld by this court as not in violation of article 1, §23, of the Constitution of Indiana, in a number of cases in which the question was carefully considered, and no reason is seen for a change of view in respect to that question. *School City of Elwood* v. *State ex rel. Griffin* (1932), 203 Ind. 626, 631, 180 N. E. 471, 473, 81 A. L. R. 1027; *Ratcliff* v. *Dick Johnson School Twp.* (1933), 204 Ind. 525, 185 N. E. 143; *Kostanzer et al.* v. *State ex rel. Ramsey* (1933), 205 Ind. 536, 187 N. E. 337; *Brumfield, Trustee* v. *State ex rel. Wallace* (1934), 206 Ind. 647, 190 N. E. 863.

In *School City of Elwood* v. *State ex rel. Griffin, supra,* it was held that the marriage of a woman teacher of itself does not constitute "good and just cause" for cancellation of a tenure teacher's indefinite contract, and,

since that time, the question has been decided upon authority of that case. In *Kostanzer et al.* v. *State ex rel. Ramsey, supra,* the decision was based entirely upon the former case, but it was recognized that if marriage were a sufficient ground for canceling the contract it would be a sufficient basis for an enforceable rule, the violation of which might be the basis for a cancellation of the contract. In the case at bar we have not only a rule against marriage, but a recognition of the rule in the contract itself which contemplates a dismissal upon marriage.

The frequency with which the question has arisen in this and other jurisdictions has prompted a re-examination of the question and of the reasons and authorities relied upon.

In *School City of Elwood* v. *State ex. rel. Griffin, supra,* it is said that (p. 631) : "The Teacher's Tenure Law specifically enumerates the causes for which a teacher may be removed or dismissed." That: "Where the statute specifically enumerates the causes for which a teacher may be removed or dismissed, the teacher cannot be removed or dismissed for any other cause." A number of cases are cited to support this proposition of law, and an examination discloses that in all of the cases the legislative provision did expressly enumerate and limit the causes for which a teacher might be dismissed. See *Kennedy* v. *San Francisco Bd. of Education* (1890), 82 Cal. 483, 22 Pac. 1042; *Butcher* v. *Charles* (1895), 95 Tenn. 532, 32 S. W. 631; *Courtright* v. *Mapleton* (1927), 203 Iowa, 26, 212 N. W. 368; *Custer* v. *School District of Borough of Prospect Park* (1899), 12 Pa. Superior Ct. 102; *Jameson* v. *Union Dist. Board* (1914), 74 W. Va. 389, 81 S. E. 1126; *People* v. *Maxwell* (1904), 177 N. Y. 494, 69 N. E. 1092; *State ex rel.* v. *School Directors* (1923), 179 Wis. 284, 191 N. W.

746, 747; *Blair* v. *United States ex rel.* (1916), 45 App.
D. C. 353.

But the causes for dismissal are not so limited in the
Teachers' Tenure Statute in this state. The statute,
section 28-4308 Burns' Ann St. 1933, section
6004 Baldwin's 1934, provides that: "Cancellation
of an indefinite contract of a permanent teacher
may be made for incompetency, insubordination, . . .
neglect of duty, immorality, justifiable decrease in the
number of teaching positions or other good and just
cause, but may not be made for political or personal
reasons." In other words, a teacher's contract may be
canceled without any showing of incompetency, insub-
ordination, neglect of duty, immorality, or justifiable
decrease in the number of teaching positions, if there is
"other good and just cause," and the dismissal is not for
"political or personal reasons." It is clear therefore
that, unless the words, "other good and just cause,"
are ignored, which is not permissible, there is authority
to dismiss for other causes than those specifically
enumerated in the statute. It must also follow that
jurisdiction and discretion to determine what these
causes may be is in the school authorities, limited only
by the provision that they must be good and just causes,
and that dismissal may not be for political or personal
reasons. The opinion goes further and says that (p. 631) :
"The appellants admit that they did not take the action
complained of because of the 'incompetency, insubordi-
nation . . . neglect of duty, (or) immorality' of the
teachers involved, nor because of 'justifiable decrease
in the number of teaching positions' but contend that
their action was properly and lawfully taken under the
remaining ground stated in the statute, viz., 'other good
and just causes,' *i. e.* a cause which bears a reasonable
relation to the specific causes enumerated. If a teacher,

after marriage, becomes inefficient, impaired in her usefulness, neglectful or otherwise incapable of performing her duties as a teacher in a proper manner, then good reason—'other good and just cause'—would exist for her dismissal; but marriage in itself (in the absence of a statutory provision to the contrary), does not constitute a good and just cause (as provided in the teachers' tenure law) for the discharge of a teacher. Marriage as an institution involves no element of wrong, but, on the contrary, is protected, encouraged and fostered by a sound public policy. The arbitrary determination of the school board that the marriage of women teachers . . . was 'good and just cause' for their removal is, as a matter of law, declared to be erroneous and invalid. *Richards* v. *School Dist.* (1916), 78 Ore. 621, 153 Pac. 482, 485, L. R. A. 1916 C, 789, Ann. Cas. 1917D, 266." But it is clear that anything which would cause a teacher to become incompetent, insubordinate, neglectful of duty, or immoral is covered by those specific causes for cancellation of a contract, and if "other good and just cause" is limited to such matters as result in incompetency, insubordination, neglect of duty, or immorality, the words are mere surplusage, whereas the well-established rules of construction require that they be given effect if that is reasonably possible.

The Oregon Case relied upon holds that, if the contract stipulating that marriage should be a cause for dismissal is valid, the board cannot dismiss without complaint, notice, and hearing, which were not given the teacher, and that: "The views herein expressed might be sufficient to dispose of the instant case, but we prefer to proceed with the inquiry and determine whether the single fact of marriage can, in advance and alone, be said to be a reasonable cause for dismissal . . . . If a teacher becomes inefficient or fails to perform a duty, or does some act which of itself impairs

usefulness, then a good or reasonable cause for dismissal would exist." This is followed by a discusison of the question of whether or not marriage necessarily decreases or impairs usefulness or efficiency, and the conclusion that: "If a teacher is just as competent and efficient after marriage, a dismissal because of marriage would be capricious." The case seems to stand alone in holding that, as a matter of law, marriage is not a legal ground for dismissal where there is discretion vested in the school authorities to dismiss for just and good cause. It clearly appears that the conclusion was arrived at upon the theory that marriage does not necessarily affect the efficiency and usefulness of the teacher, and that there are no other considerations which may enter into the question.

But there may be other considerations. The school system is not an end in itself. It is but a means of advancing the general welfare. The schools are intended to serve the community, and are but one instrumentality designed to that end. The local school authorities are vested with broad discretionary powers in the management of schools. They are free to adopt policies which are not in conflict with the statute, and no reason is seen why they may not look to the general welfare of the community, as well as to the welfare of the school, in matters affecting school policy. The schools are dependent upon the local community for support, and the welfare and prosperity of the school system is necessarily linked to the welfare and prosperity of the community. If there are unmarried, qualified teachers, residents of the community, who are unemployed, and who may be driven to leave the community and reside elsewhere if they are not employed locally, it is a matter of interest to the community, and therefore to the school system of the community. Local school authorities are elected locally and their policies will normally reflect the will

of the community. In the first instance the school authorities are perfectly free to exercise their discretion as to who shall be employed, and to select men or women, married or single, teachers, as in the board's discretion seems best. It was held in *Guilford School Tp.* v. *Roberts* (1902), 28 Ind. App. 355, 62 N. E. 711, that the contract of a teacher, procured upon the fraudulent representation that she was single and did not intend to marry, was void if she was in fact married at the time it was made. It is well settled that, to avoid a contract for false or fraudulent representation, the representation must concern a material fact affecting the rights of the parties. If marriage is a matter that the school authorities may not take into consideration in employing teachers, if it cannot in any way affect the school or community, if it is an entirely irrelevant and immaterial matter, the decision was wrong. But we do not think so. It cannot be questioned that, in selecting teachers, school authorities may properly choose citizens of the United States as against aliens, and residents of this state as against non-residents. It cannot be doubted that a provision in the contract of a tenure teacher, conforming to a rule or policy adopted by the school authorities, providing that the contract may be terminated if the teacher became a non-resident of the United States, or of the state of Indiana, or of the city or school district, would be enforced. Such a rule and policy might well be sustained in reason, although all might not agree upon the policy. Advantage might be seen in the teacher living among the parents and patrons of the school, and thus absorbing the atmosphere of the community in which the children must grow up, and acquiring a better understanding of the problems to be met by the school. Other matters of public policy might properly be considered as not arbitrary or capricious.

In *Short* v. *Poole Corporation* (1924), 1 Ch. 66, the

English Court of Appeals had under consideration the right of school authorities to cancel the contract of a teacher because of marriage. The facts and the decision reached are well summarized in the syllabus:

"The defendants, the Local Education Authority, in pursuance of a report of their Education Committee, decided that the retention of married women teachers in their public elementary schools was inadvisable, and gave the plaintiff, a married woman teacher, notice to terminate her engagement, after satisfying themselves that her husband was able to maintain her. The plaintiff had, while unmarried, been appointed in 1914 assistant mistress of one of the defendant's schools, and was admittedly an efficient teacher. In a letter to the managers of the non-provided schools of the district announcing the decision of the Education Committee, and expressing a hope that the managers would take similar action, it was stated that the Committee were led to their decision for the following reasons: (1.) They considered the duty of the married woman was primarily to look after her domestic concerns, and they regarded it as impossible for her to do so and to act effectively and satisfactorily as a teacher at the same time; and (2.) that it was unfair to the large number of unmarried teachers who were at present seeking situations that the positions should be occupied by married women who presumably had husbands capable of maintaining them. The plaintiff sought a declaration that the notice was invalid, and an injunction restraining the defendants from acting upon it:

"Held (reversing the decision of Romer J.), that the plaintiff had failed to establish that the defendants had taken into account matters other than those which belonged to their educational sphere; that neither their decision nor either of the reasons upon which it was alleged to be founded was alien or irrelevant to the

maintenance of the efficiency of the public elementary schools or the cause of education in the district; that their willingness to make concessions in cases of grievious hardships did not invalidate their policy of maintaining educational efficiency; and that as the defendants had acted bona fide and within their statutory powers, the Court would not interfere."

The same view was taken in two other cases, *Fennell* v. *East Ham Corporation* (1924), 1 Ch. 641, and *Price* v. *Rhondda Urban District Council* (1922), 2 Ch. 372.

In *Ansorge* v. *Green Bay* (1929), 198 Wis. 320, 325, 224 N. W. 119, 121, the Supreme Court of Wisconsin said that: "In the selection of teachers a board like the one herein of necessity must be and ordinarily is clothed with a broad power of discretion. It may be conceded that a married teacher can ordinarily perform her duties as satisfactorily as an unmarried one, but the board is charged with a duty which requires it to promote the public interests. On a policy such as is manifested in the instant case there may be a wide difference of opinion. Many circumstances may exist with reference to a particular school which might lead to the belief that a male teacher would be more suitable for employment than a female teacher. On the other hand, the same may be said with respect to married and unmarried teachers. In the employment of teachers the board must be and ordinarily is vested, as is heretofore said, with a wide discretion, and when such discretion is exercised in good faith and is not contrary to law, the exercise of such discretion should not be interferred with or controlled by the courts."

In *Rinaldo* v. *Dreyer* (Mass. Sup. 1936) 1 N. E. (2d) 37, the most recent case involving a tenure teacher's contract, the Supreme Court of Massachusetts said (p. 38) :

"The primary question to be decided is whether if a school committee has adopted a policy forbidding the employment of married women teachers, the marriage

of a woman teacher can be found to be 'good cause' for dismissal" under a statute which "provides that a teacher employed at discretion 'shall not be dismissed, except for inefficiency, incapacity, conduct unbecoming a teacher . . . insubordination or other good cause.' We think the answer must be in the affirmative.

" 'Good cause' for dismissal in a statute of this kind is by no means limited to some form of inefficiency or of misconduct on the part of the person dismissed. . . . Such matters are amply covered by the words which precede 'good cause.' Good cause includes any ground which is put forward by the committee in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the committee's task of building up and maintaining an efficient school system. (Authorities.)

"If the cause assigned is at least fairly debatable and is asserted honestly, and not as a subterfuge, that is enough. Whether or not married women should teach in public schools is a matter about which there may be an honest difference of opinion. We need not elaborate the possible arguments. It is enough to say that reported decisions in various jurisdictions show that many local school boards in widely scattered parts of this country and in England have taken the same attitude which the respondents here take. The committee have 'general charge' of the public schools in Revere. . . . It is for them and not for the court to determine matters of policy. We are aware that some courts have come to the opposite conclusion, but we find ourselves unable to agree with them."

To the same effect, see *Masten* v. *Maxwell, Superintendent of Schools* (1903), 83 N. Y. Sup. 1089, and *Backie* v. *Cromwell Consol. Dist. No. 13* (1932), 186 Minn. 38, 242 N. W. 389. The judges dissenting in the last case cited, concurred in this view, but dissented upon another point.

It thus appears that the great weight of authority supports the view that, where the action is taken pursuant to a policy adopted in good faith, marriage is a good and just cause for the cancellation of a tenure teacher's contract when the contract is made with specific reference to, or with full knowledge of, the rule or policy. Sound reason supports this view, and it must be concluded that this court has been resting in error. The case of the *School City of Elwood* v. *State ex rel Griffin, supra,* in so far as it is in conflict with the views here expressed, is overruled. The subsequent cases dealing with the question were decided upon authority of that case.

Judgment reversed, with instructions to restate the conclusions of law, and enter judgment for appellants.

Treanor, J., dissents.

## DISSENTING OPINION

TREANOR, J., DISSENTING—The trial court's conclusions of law 3 and 4 were as follows:

"3. That the rule and regulation and resolution adopted by the Board of Education on the 10th day of May, 1933, which provided that married women would not be employed as teachers in said school system was void and unreasonable under the law applicable to permanent teachers with indefinite contracts and was unenforcible as against relatrix.

"4. That any provision inserted in the contract between the School City of East Chicago, Indiana, and the realtrix mentioned in Finding No. 6 herein which provided that said contract would be void or would operate as a termination of the indefinite contract between the realtrix and said School City if said realtrix should marry, was void and unlawful."

The foregoing conclusions of law present to this court the following questions: (1) Does marriage by a female teacher who is a permanent teacher under an indefinite

contract constitute good and just cause for cancellation of her contract. (2) If such marriage is not of itself a good and just cause for cancellation can it become such by reason of the school board's adopting a rule prohibiting marriage by female teachers, and by providing as a term of the contract that such marriage should operate as a termination of the indefinite contract.

In *School City of Elwood et al.* v. *State ex rel. Griffin,*[1] this court held that marriage of a woman teacher, in and of itself, does not constitute "good and just cause" for the cancellation of an indefinite contract. In *Kostanzer* v. *State ex rel. Ramsey*[2] it was held that "a rule forbidding marriage of a woman teacher or declaring that her marriage must 'automatically terminate her services as a teacher' is not a reasonable rule" for the reason that "marriage bears no reasonable relation to her fitness or capacity to hold the position of teacher in the public schools and to discharge the duties thereof."

Under the authority of the two foregoing cases, the trial court's conclusions of law were correct. It is true that in the instant case the relatrix's contract provided that marriage by her would operate to terminate her contract; but it cannot be within the legal power of a school board, by the simple expedient of a rule and a contract provision, to create "a good and just cause" for cancellation of a teacher's contract out of a fact which as a matter of law, is not a "good and just cause." Consequently, the reasoning and results of the *City of Elwood and Kostanzer* cases are repudiated by the conclusion of the court in the instant case that "where the action (i. e. cancellation) is taken pursuant to a policy adopted in good faith, marriage is a good and just cause for the cancellation of a tenure teacher's contract when

1. (1932), 203 Ind. 626, 180 N. E. 471.
2. (1933), 205 Ind. 536, 545, 187 N. E. 337.

the contract is made with specific reference to, or with full knowledge of, the rule or policy."

The majority opinion assumes that this court, in City of Elwood, ignored the effect of the statutory language "other good and just cause" and improvidently relied upon cases decided under statutes which recited only certain specific causes. A superficial examination of the opinions in the two cases reveals the inaccuracy of that assumption. These cases rested upon a rule of statutory construction and a legal standard, both of which have been recognized and approved by this court. In City of Elwood this court construed the phrase "other good and just cause" to include only causes which bore "a reasonable relation to the specific causes enumerated."[3] This limitation of the effect of "other good and just cause" was in harmony with the so-called *ejusdem generis* rule, which was summarized as follows in *Yarlott* v. *Brown*:[4] "A familiar rule of statutory construction is that, where words of specific and limited signification in a statute are followed by general words of more comprehensive import, the general words shall be construed to embrace only such things as are of like kind or class with those designated by the specific words, unless a contrary intention is clearly expressed in the statute"; and which was given effect in that case by the following statement: "When the language of the statute under consideration is tested by this rule it becomes obvious that the 'other written contracts for the payment of money' referred to in the fifth clause, after mentioning promissory notes and bills of exchange, include drafts, letters of credit, checks, acceptances, duebills, bonds, and all personal obligations which merely bind the maker to pay money, of the same general character as promissory notes and bills of exchange; but that the

3. *City of Elwood* v. *State ex rel., supra,* at page 632.
4. *Yarlott* v. *Brown* (1923), 192 Ind. 648, 653, 138 N. E. 17.

words are not used in their most comprehensive sense."

So in City of Elwood this court believed that the words "other good and just cause" were not used by the General Assembly "in their most comprehensive sense," but only to include such things as are of like kind and class with those designated by the specific words "incompetency, insubordination, neglect of duty (or) immorality . . ." No contrary legislative intention is found in the provisions of the Tenure Act; and the general spirit and policy of the Act is against construing "other good and just cause" to include any cause that does not relate to the teacher's capacity to properly satisfy the requirements of his position.

Futhermore, I think the reasoning in City of Elwood was supported by decisions cited therein. It is true that decisions were relied upon which held that when a tenure statute enumerates certain specific causes for termination of tenure no other cause can constitute legal cause. When this court, as a preliminary matter, decided that "other good and just cause" included only causes which bore a reasonable relation to the specified causes, certainly the decisions in question were properly relied upon as authority for eliminating from consideration all causes except those enumerated, and others which bore a reasonable relation thereto.

An essential element of our decisions in the City of Elwood and Kostanzer cases was the judicial definition of "legal cause" which had been announced by this court in decisions long prior to those cases. In the case of State ex rel. Manning v. Mayne,[5] decided by this court in 1879, the question of what constituted legal cause was presented to this court in connection with the controversy over the removal of a Warden of the Northern Indiana State Prison. A section of the act which related to the management of the prison authorized the direc-

5. (1879), 68 Ind. 285, 295.

tors to elect a warden who should "hold his office for the term of four years unless sooner removed by the directors for cause . . ." This court assumed that cause meant "legal cause," and defined it as follows: "The cause must be one amounting to malfeasance in office, or showing that he has not, in some particular, faithfully and impartially discharged his duties as warden; and certainly, as it seems to us, the cause for removal must be founded on some matter or thing done, or omitted to be done, by the warden, in reference to which the law has given the directors the right and power to supervise, control and enforce the acts of the warden."

In the case of *Roth* v. *State ex rel. Kurtz*[6] this court commented as follows on "legal cause": "This statute declares in general terms that the removal must be for cause, and this, as the authorities affirm, necessarily and reasonably implies that the cause intended is to be some dereliction or general neglect of duty, or some delinquency affecting the general character of the officer, or his fitness for holding the office, or his incapacity to discharge his duties thereof. Mechem on Public Officers, §457; *People* v. *Fire Commissioners,* 72 N. Y. 445; *People* v. *Fire Commissioners,* 73 N. Y. 437."

In *State ex rel. Felthoff* v. *Richards,*[7] this court had occasion to consider the legal standard to be applied for the purpose of determining whether legal cause existed, and reaffirmed the doctrine of the cases of *State ex rel. Manning* v. *Mayne, supra,* and *Roth* v. *State ex rel, supra,* in the following language: "Any one of common understanding knows that the General Assembly intended to stop the indiscriminate dismissal of firemen and policemen each time there should be a change in political control of the city administration. To give effect to this purpose the statute requires that a dis-

6. (1902), 158 Ind. 242, 254, 63 N. E. 460.
7. (1932), 203 Ind. 637, 643-44, 180 N. E. 596.

missal must be for cause; and to further protect the person under charges he is entitled to have a hearing and to have 'the written reason for such removal' entered upon the records of the board. The statute forbids 'politics' being considered a 'cause'; and under the decisions of this court no 'cause' is a legal cause unless it bears a reasonable relation to the policeman's or fireman's 'fitness for holding the office, or his incapacity to discharge the duties thereof'."

In *School City of Elwood* v. *State ex rel. supra,* this court held that "other good and just cause" embraced only causes which bear a "reasonable relation to the specific causes enumerated," that is incompetency, insubordination, neglect of duty, or immorality. This necessarily reaffirmed the doctrine of the earlier cases that a cause, within the meaning of "good and just cause" must be some dereliction or general neglect of duty, or some delinquency affecting the general character of the officer, or employee or his fitness for holding the office, or his incapacity to discharge his duties thereof.

In *Kostanzer* v. *State ex rel., supra,* this court restated its adherence to the legal test of "cause" which had been announced in the previous cases, and expressly held that marriage of a female teacher did not constitute good and just cause for cancellation, and that the local school board was without power to make it a good and just cause by adopting a rule which forbade marriage. In that case it was stated that: "The reason for our holding in *School City of Elwood* v. *State ex rel. Griffin, supra,* that marriage of a woman teacher is not legal cause for cancellation of her contract is that her marriage bears no reasonable relation to her fitness or capacity to hold the position of teacher in the public schools and to discharge the duties thereof."

The foregoing decisions had firmly and definitely established a legal standard which was binding upon all

courts of this state as a test of "cause" for termination of a legally protected tenure of public office or employment. A legal standard is as much a part of the body of our law as are rules and principles. The legal standard which is applied to determine whether certain conduct constitutes negligence is as definitely a part of the law of negligence as is the rule of law that contributory negligence defeats the plaintiff's cause of action. And the legal standard for the determination of *legal cause,* in tenure cases, has been as definitely fixed by our judicial decisions as has the standard for negligence. Consequently, since the General Assembly used the language "other good and just cause" it adopted as the test for "cause" the legal standard declared by this court. When the General Assembly uses words or phrases which have received a construction by this court such construction is enacted into the statute unless a different intent clearly is disclosed. Therefore, the actual result of the majority decision is not only to nullify a long line of decisions of this court, but also to amend the Teachers' Tenure Act of 1927.

The following statement is found in the majority opinion: "A teacher's contract may be canceled without any showing of incompetency, insubordination, neglect of duty, immorality, or justifiable decrease in the number of teaching positions, if there is 'other good and just cause,' and the dismissal is not for 'political or personal reasons.' It is clear therefore, that, unless the words, 'other good and just cause,' are ignored, which is not permissible, there is authority to dismiss for other causes than those specifically enumerated in the statute. It must also follow that jurisdiction and discretion to determine what these causes may be is in the school authorities, limited only by the provision that they must be good and just causes, and that dismissal may not be for political or personal reasons." The fallacy in

the foregoing statement is the assumption that "other good and just cause" would be ignored unless "other good and just cause" includes something more than, and different from, the specifically enumerated causes.

But in the City of Elwood and Kostanzer Cases, *supra*, this court did not ignore the language in question, but gave it what the court considered its proper legal effect. It is true, as pointed out in the case of *Strange* v. *Board*[8], that the rule of *ejusden generis* does not apply when the prior or specific words exhaust the class, for there is nothing for the remaining terms to qualify. In that case it was urged that the rule of *ejusdem generis* should be applied, and that the phrase "other road paving material" should be held to refer to the prior words "stone" or "gravel," and limit the material on country roads to stone or gravel or like material. This court properly disposed of this contention in the following language: "Here the words 'stone' and 'gravel' entirely exhaust each class, and unless the remaining words mean something else, they can mean nothing, which will not be imputed to them, if avoidable, and we place our decision in this respect upon the ground that the phrase 'other paving material' necessarily means something other than either stone or gravel, and that the legislature intended giving to the localities an opportunity to use such materials as were necessary or best suited to the end to be attained."

But it can not be true in fact that the specifically enumerated types of causes, viz., incompetency, insubordination, neglect of duty, and immorality, embrace all types of personal disqualifications which would justify cancellation of a teacher's contract. The specific terms incompetency, neglect of duty and immorality have a well understood and limited meaning, and insubordination is defined in the Teachers' Tenure Act as

8. (1910), 173 Ind. 640, 91 N. E. 242.

"a wilful refusal to obey the school laws of this state or reasonable rules prescribed for the government of the public schools of such corporation" which statutory definition restricts its scope to narrow limits. And in the case of *Stiver, Trustee* v. *State ex rel. Kent*,[9] the opinion expressly stated that "lack of cooperation" was a legal cause within the meaning of "other good and just cause." The following excerpt is from the opinion of that case (p. 386) : "The latter cause (that is lack of cooperation) is not one of the statutory causes which is expressly specified. But we think it is legal cause within the provision 'other good and just cause.' In accordance with our holding in *State ex rel. Felthoff* v. *Richards, supra,* 'other good and just cause' would include any cause which bears a reasonable relation to the teacher's 'fitness or capacity to discharge the duties of his position.' A court can not say as a matter of law that ability and willingness to cooperate are not reasonably related to the fitness or capacity of a teacher for the performance of his duties."

The Massachusetts statute specifies "conduct unbecoming a teacher" which clearly is more comprehensive than the term "immorality" in our statute; and which comprehends types of conduct which would materially affect the personal fitness of a teacher and yet would not be included in any of the causes specifically enumerated in the Indiana Act.

The opinion of the majority treats the case of *Guilford School Township* v. *Roberts*[10] as supporting authority. The material facts in that case were that the township trustee told the applicant that he would not employ a woman teacher who was married. The applicant was in fact married when a contract was executed and falsely represented that she was unmarried in order to

9.   (1936), ante 380, 1 N. E. (2d) 1006.
10.   (1902), 28 Ind. App. 355, 62 N. E. 711,

induce the trustee to enter into the contract. The teacher having induced the trustee to enter into the contract by a fraudulent misrepresentation respecting a fact which the trustee was privileged to consider material, this court properly held that the trustee could repudiate the contract. It is true that "the representation must concern a material fact affecting the rights of the parties;" but "it may be stated as a rule that it is always material if, had it been known to be false, the contract would not have been entered into.[11] The Guilford Township Case, *supra*, is not authority for the proposition that the school township could have repudiated its contract if the teacher had married during the school term in violation of her promise not to do so. In that situation the township could not have justified, legally, its repudiation of the contract unless marriage by the teacher prevented her performance of the contract. But since there was no legal restriction upon the discretion of the township trustee he was free to insist, as a condition precedent to contractual liability, that the teacher be an unmarried woman. School officials have free discretion in the choosing of individuals if the individuals have the minimum legal qualifications. But it does not follow that every fact which school officials may take into consideration in employing teachers, can under the guise of carrying out some special policy, be made a legal cause for cancellation of a tenure contract. Under the Tenure Act causes for cancellation of indefinite contracts must be legal causes, even though *causes* for contracting or not contracting with non-tenure teachers may still be the idiosyncracies of employing officials.

The reasoning and conclusion of the majority as revealed in the opinion rest heavily upon the recent

11. Corpus Juris, Vol. 13, §204, p. 390.

Massachusetts Case of *Rinaldo* v. *Dreyer.*[12] But three decisive factors are implicit in the reasoning and conclusion of the Massachusetts Supreme Court that have no legitimate place in our consideration of the merits of the instant case. (1) Local autonomy in school administration exists to a much greater degree in Massachusetts than in Indiana. Our legal concept of a general and uniform system of schools constituting a state institution, in the strictest sense, is unknown to the Massachusetts law. (2) The judicial definition of "cause" applied by the Massachusetts courts is embodied in the following statement from *Ham* v. *Boston Board of Police*:[13] "It (i. e. the police board) may also remove any officers or members of the department for cause; that is, for *such cause as seems to it sufficient,* after the party has had notice and an opportunity to be heard in defense or explanation of whatever may be suggested as a cause of removal." (our italics.) And (3) the type of teacher employed under consideration in *Rinaldo* v. *Dreyer, supra,* is an employment at discretion of the school committee. No such type of teacher employment is known to the Indiana law governing employment relation of school corporations and teachers.

Prior to the amendment of the Massachusetts school code in 1934 the Supreme Court of Massachusetts had frequently discussed the legal signification of "employment at discretion." The substance of many statements was that under an "employment at discretion" the school committee had freedom to act "according to honest judgment."[14] And in *Sheldon* v. *School Committee of Hopedale,*[15] it was said that "A decision that wise administration of public schools calls for the elimination of women teachers if they are married is not so irra-

---

12.   (1936), 1 N. E. (2d) 37 (Mass.).
13.   (1886), 142 Mass. 90, 95, 7 N. E. 540.
14.   *Paquette* v. *Fall River* (1932), 278 Mass. 172, 174, 179 N. E. 588.
15.   (1931). 276 Mass. 230, 236, 177 N. E. 94.

tional that it is inconsistent in law with good faith in dealing with a question of dismissal." The result was that a local committee had the legal power to dismiss a teacher employed "at discretion" for any cause which was not so irrational that a court could say as a matter of law that it showed bad faith on the part of the committee.

When the Massachusetts school code was amended in 1934 it was provided that teachers "employed at discretion" should not be dismissed "except for inefficiency, incapacity, conduct unbecoming a teacher . . . insubordination or other good cause . . ."[16] The Rinaldo Case, which involved a teacher employed at discretion, was decided after the amendment was made. But in construing and applying the language of the statute the Massachusetts Supreme Court was not free, without legal reason, to disregard its previous holdings respecting the legal signification of "employment at discretion" and "cause." Consequently, that court consistently with judicial reasoning could declare the law in Massachusetts to be that "good cause includes any ground which is put forward by the committee in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the committee's task of building up and maintaining an efficient school system;"[17] and properly could state; "If the cause assigned is at least fairly debatable and is asserted honestly, and not as a subterfuge, that is enough."[18] But the Rinaldo case does not justify this court's abandoning a long recognized legal standard of "cause" and adopting the Massachusetts standard which rests upon legal and factual elements peculiar to the legal character of the Massachusetts school system, judicial precedents of that jurisdiction, and special provisions of the Massachusetts school code.

16. Acts and Resolves of Mass. 1934, ch. 123, p. 120.
17. *Rinaldo* v. *Dreyer, supra*, p. 38.
18. Id. p. 38.

Under a tenure statute with provisions similar to those of the Indiana Act the Supreme Court of New Jersey has held that marriage of a female teacher is not a legal cause for termination of tenure. The following excerpts from the opinion of that court form an interesting contrast to the reasoning and conclusion of the Supreme Court of Massachusetts and of the majority opinion:[19]

"The argument advanced for the prosecutor is that the clause in this statute reading 'or other just cause' will support a discharge on the ground of marriage; in other words, that the fact of marriage is a 'just cause' for dismissal. The state board pointed out, and we think correctly, that 'these words in the tenure act must be read in conjunction with those immediately before them, and they imply a dereliction by the teacher, which may be the subject matter of the charge against her.' With this conclusion and reasoning we agree. There is perhaps room for argument that a married woman, on account of her duties of her husband and family, is not as well qualified to perform those of a teacher in addition; but this is a matter for the Legislature.

". . . On the fundamental ground that the statute does not contemplate the fact of marriage as a just cause, we are in accord with the finding of the two tribunals below."

It is a novel suggestion that local school officials who are administrative officials of the state school system, can use that part of the state school system over which

19. *School Dist. of Wildwood* v. *State Board of Education* (1936), 116 N. J. L. 572, 185 Atl. 664, 665.

Pertinent provisions of the New Jersey statute, which are substantially the same as those of the Massachusetts and Indiana statutes, are as follows: "No principal or teacher shall be dismissed or subjected to reduction of salary in said school district except for inefficiency, incapacity, conduct unbecoming a teacher or other just cause, and after a written charge of the cause or causes shall have been preferred against him or her," etc. Chapter 243, §1, P. L. 1909, as amended (N. J. St. Annual 1935, §185—106a).

they have supervision and control, for the purpose of giving effect to their social, economic, or political policies, even through the officials honestly believe that the carrying out of the policies may be "a matter of interest to the community and therefore to the school system of the community." (Majority opinion.) It is of course true, as stated in the majority opinion, that the school system of Indiana is a means to an end and that the purpose and justification of its existence is the promotion of the general welfare. But it is equally obvious that the contribution of our public school system to the general welfare should be made by it as an educational institution. Local school officials undoubtedly have wide discretion in the management of local school affairs; but this discretion is limited to choice of methods and means of improving the local schools as an educational institution. The Constitution of Indiana expressly recognizes that the public school system is to make its contribution to general welfare by diffusing "Knowledge and learning, . . . throughout a community."[20]

In the instant case the rule against marriage of female teachers seems to be justified on the ground that it would be of advantage to the community to encourage "unmarried teachers residents of the community, who are unemployed" (majority opinion) to remain in the community. It is elementary that if marriage, in and of itself, is not cause for cancellation of a contract, and if to treat it so would be a violation of the Teachers' Tenure Act, it could not be made a legal cause through the device of a rule prohibiting marriage plus a contractual

20. Article 8, Sec. 1, Indiana Constitution: "Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for the general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."

provision for termination of the contract of employment in case of marriage. This would be a fraud upon the law and any such rule and contract based thereon would be void as against public policy. Consequently, if the arrangement in the instant case can give validity to the act of the school board, it must be because the school board has a discretionary power, independent of and superior to the statute, to decide that certain policies would be beneficial to the community generally and to utilize its administrative power as an official school body to give effect to any of these policies.

If we grant the validity of the foregoing reasoning, which seems to be the substance of the majority opinion's reasoning, the result is that the scope of "other good and just cause" will be limited only by the capacity of local school boards to discover policies for the community which apparently could be advanced by cancellation of indefinite contracts. And it will become increasingly difficult, if not impossible, for a teacher to retain a tenure position by relying solely upon professional qualifications and personal competency.

The foregoing reasoning and results affect all public employees whose tenure of position is protected by statutory provisions prohibiting dismissal without cause.

In my opinion a legal power of a school board is limited to taking action which directly concerns the educational function of that part of the state system of public schools which is under its jurisdiction. Since the Teachers' Tenure Act expressly takes away the power of local boards to cancel indefinite contracts of permanent teachers except for certain specifically enumerated causes, or "other good and just cause," I believe that it is not within the power of such board to cancel a contract except for one or more of the causes specifically enumerated, or for some other cause which affects the

ability of the teacher to make his proper contribution to the educational function of the local school system.

In my judgment the cases of *City of Elwood* v. *State ex rel. Griffin,* and *Kostanzer* v. *State ex rel. Ramsey, supra,* correctly construed and applied the provisions of the Teachers' Tenure Act relative to cancellation of contracts for cause. It is my further judgment that those cases were in harmony with, and rested upon sound doctrines which had been applied by this court in the earlier cases of *State ex rel. Felthoff* v. *Richards, Roth* v. *State ex rel. Kurtz,* and *State ex rel. Manning* v. *Mayne, supra.* And it is my conviction that the Indiana cases are in accord with sound legal reasoning and supported by the weight of that authority which is properly applicable to the problem involved.